FILED
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
2/12/20
**JEFFREY P. COLWELL, CLERK**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No**. 19-cv-03520-KLM**

**FREDERICO GILBERT VALDEZ, III**,

       Plaintiff,

v.

**THE CITY AND COUNTY OF DENVER**;
**DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER**;
**GARETH STEPP**, in his individual capacity;
**DARRYN BROWN**, in his individual capacity;
**JAMES JOHNSON**, in his individual capacity;
**CHRISTIAN STOB**, in his individual capacity;
**DAVID KLOTZ**, in his individual capacity;
**STEPHANIE MONTOYA**, in her individual capacity;
**KIMI ANDAYA**, in her individual capacity;
**EMILY DRANGINIS**, in her individual capacity;
**LORETTA LINDSEY**, in her individual capacity;
**LINDSAY YAGER**, in her individual capacity;
**TAMATHA ANDING**, in her individual capacity;
**ANDREA JOHNSON**, in her individual capacity;
**CHRIS BREZNAY**, in his individual capacity.

       Defendants.

---

## AMENDED COMPLAINT & JURY DEMAND

---

Plaintiff, Frederico Gilbert Valdez III, by and through his attorney, John F. Poor of the law firm of Heideman Poor, LLC, hereby submits his Amended Complaint & Jury Demand. He states as follows:

### INTRODUCTION

1

1. On September 14, 2017, Plaintiff, Frederico Gilbert Valdez, III, underwent what should have been a routine tooth extraction while housed in Denver's Van Cise-Simonet Detention Center ("Denver Detention Center" or "Detention Center") as a pretrial detainee.  The day after the procedure, Plaintiff Valdez began to develop symptoms of a serious and rapidly progressing infection in his lower left jaw.  Over the coming days, Plaintiff Valdez repeatedly sought assistance from officers and medical personnel in the Detention Center.  In response, these officials repeatedly and persistently dismissed Plaintiff Valdez's complaints and minimized the severity of his symptoms.  By the morning of September 18, 2017, the infection had become so severe that Plaintiff Valdez could not wait any longer, and he began demanding that he be transported off-site to Denver Health Medical Center for further treatment.  In response, medical and correctional personnel in the Detention Center belittled Plaintiff Valdez, humiliated and demeaned him in front of other inmates, accused him of faking, exaggerating and "fucking lying," and repeatedly refused to provide appropriate medical treatment over a period of several hours.  It was not until late in the evening on September 18 that personnel finally realized that Plaintiff Valdez was not faking or exaggerating, that his infection was severe, worsening and potentially life threatening, and that he required emergent treatment.

2. As a result of the dismissiveness and neglect demonstrated by multiple personnel in the Denver Detention Center, Plaintiff Valdez was placed in intensive care upon arrival at Denver Health Medical Center.  He was subsequently diagnosed with a significant left-

side submandibular abscess, resulting in airway deviation.  The abscess required surgical

intervention and required a multi-day hospital stay.

3. The outrageous conduct by Denver Health and the City and County of Denver, and their

respective officials, violated Plaintiff Valdez's federal and state law rights. This suit is

brought to hold to account the officials who cruelly chose convenience over compassion.

## JURISDICTION & VENUE

4. This action arises under the Constitution and laws of the United States, including 42

U.S.C. § 1983. This Court has jurisdiction over Plaintiff's federal constitutional claims

pursuant to 28 U.S.C. §§ 1331 and 1343 and jurisdiction over Plaintiff's pendent state

law claims pursuant to 28 U.S.C. §1367. Jurisdiction supporting Plaintiff's claim for

attorney fees and costs is conferred by 28 U.S.C. § 1988.

5. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). The Plaintiff

resides in Colorado, all Defendants reside within the District of Colorado, and the events

described in this Amended Complaint occurred in the District of Colorado.

6. Plaintiff has complied with the notice requirements of the Colorado Governmental

Immunity Act, § 24-10-109, C.R.S. by tendering timely notice of claim to the governing

bodies implicated by this action.

## PARTIES

7. Plaintiff, Frederico Gilbert Valdez III, is and was at all relevant times a resident of the

State of Colorado.  His address is 1878 South Ammons Street, Unit A, Lakewood,

Colorado 80232.

8.  Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of both the Denver Police Department and the Denver Sheriff's Department. At all relevant times, Defendant Denver had a nondelegable duty to provide adequate medical care to inmates and detainees at the Denver Detention Center.

9.  Defendant Denver Health and Hospital Authority d/b/a Denver Health Medical Center ("Denver Health") was created in 1994 by Colorado statute and is a political subdivision of the State of Colorado. At all times relevant to the subject matter of this litigation, Defendant Denver Health acted under color of state law by providing medical services and care at the Detention Center pursuant to an agreement (or agreements) with the City and County of Denver.

10. Defendant, Gareth Stepp, was at all relevant times a resident of the State of Colorado and an employee of the Denver Sheriff's Department. Defendant Stepp resigned his position in the fall of 2018 after pleading guilty to criminal charges stemming from his commission of insurance fraud. At all relevant times, Defendant Stepp was acting in the course and scope of his official duties and employment and under color of state law in his capacity as a deputy for the City and County of Denver at the Detention Center.

11. Defendant, Darryn Brown, was at all relevant times a resident of the State of Colorado and an employee of the Denver Sheriff's Department. At all relevant times, Defendant Brown was acting in the course and scope of his official duties and employment and under color of state law in his capacity as a deputy for the City and County of Denver at the Detention Center.

12. Defendant, James Johnson, was at all relevant times a resident of the State of Colorado and an employee of the Denver Sheriff's Department.  At all relevant times, Defendant Johnson was acting in the course and scope of his official duties and employment and under color of state law in his capacity as a captain for the City and County of Denver at the Detention Center.

13. At all times relevant to this Amended Complaint, Defendant Christian Stob, D.O., Defendant David Klotz, LPN, Defendant Stephanie Montoya, LPN, Defendant Kimi Andaya, DDS, Defendant Emily Dranginis, PA, Defendant Loretta Lindsey, RN, Defendant Lindsay Yager, RN, Defendant Tamatha Anding, RN, Defendant Andrea Johnson, RN, Defendant Chris Breznay, RN, Defendant R. Edwards were residents of the State of Colorado.  At all relevant times, these Defendants were responsible for providing medical care to inmates at the Denver Detention Center.  In so doing, they were acting within the scope of their official duties and employment and under color of state law in their capacities as employees and/or agents of Denver Health and/or the City and County of Denver.

**GENERAL ALLEGATIONS**

14. At all times relevant to this Amended Complaint, Plaintiff, Frederico Gilbert Valdez, III was housed in the Van Cise-Simonet Detention Center as a pre-trial detainee.  He was housed in Unit 3F.

15. On or about September 14, 2017, Plaintiff Valdez underwent an extraction of his number 17 tooth, the third molar on the lower left side of his mouth.  The procedure was

performed by Defendant Dr. Kimi Andaya, DDS with the assistance of Lindsay Yager, RN.

16. During the procedure, Defendants Andaya and/or Yager noted that there was perio involvement, meaning that there was inflammation of the gum around the tooth, likely due to infection. Although contemporaneous records indicate that there was perio involvement on tooth number 17, no antibiotics were given to Mr. Valdez before, during, or on the same day of the extraction procedure.

17. Lower wisdom teeth like the number 17 molar are located near anatomical spaces that proximate to the throat. If those spaces get infected, it can result in the infection spreading down the neck, potentially compromising a patient's ability to breathe.

18. On September 15, 2019, the day after the procedure, Plaintiff Valdez began experiencing significant pain and observed a lump developing on the left side of his neck, suggesting the onset of a serious infection and abscess. He was also having significant problems swallowing food and liquid, and he had begun tasting indications of infection in his mouth.

19. Plaintiff Valdez promptly reported his symptoms to medical personnel, including Defendant Loretta Lindsey, RN and/or Defendant Emily Dranginis, P.A. Defendant Lindsey and/or Dranginis prescribed a course of penicillin but did not seek to provide emergent treatment or ensure that Plaintiff Valdez was examined by a medical doctor, despite the worsening state of Plaintiff Valdez's infection. During the following days, Plaintiff Valdez was not consistently provided with his medication.

20. Subsequently, the lump that Plaintiff Valdez observed continued to grow, and Mr. Valdez experienced increasingly severe and expanding pain throughout the day on September 15 and 16, 2017.  Plaintiff Valdez repeatedly used the "kite" system to report his symptoms to medical staff at the Denver Detention Center.  By September 16, 2017, the lump in Mr. Valdez's neck had roughly doubled in size, and Mr. Valdez was in significant pain.

21. Plaintiff Valdez continued reporting his symptoms to medical staff, who continued to minimize the severity of Plaintiff Valdez's condition.  At approximately 1736 on September 16, 2017, Plaintiff Valdez was examined by Defendant David Klotz, LPN, and Defendant Loretta Lindsey, RN.  Defendant Klotz noted that Plaintiff Valdez reported experiencing pain, swelling and difficulty breathing following tooth removal.  Despite Mr. Valdez's complaints that his pain was severe and worsening, Defendant Lindsey wrote that Plaintiff Valdez's throat appeared _less_ swollen than it had the previous day. She did note, however, that Plaintiff Valdez's left jaw was swollen.  Notwithstanding Plaintiff Valdez's ongoing complaints of steadily worsening symptoms and pain, Defendants Lindsey and Klotz simply provided Plaintiff Valdez with a bag of ice, told him that his symptoms were normal following a tooth extraction, and sent him back to his cell.  Neither Defendant Lindsey nor Defendant Klotz provided treatment that was appropriate in light of Plaintiff Valdez's increasingly severe symptoms.

22. By September 17, Plaintiff Valdez was suffering from sharp pains in his face, neck and chest.  The lump on the left side of his neck had grown to roughly three times its original size.  Plaintiff Valdez again reported his symptoms to medical personnel.  Once again, he was given a bag of ice and returned to his cell without further treatment.

23. At various times between September 15 and September 18, 2017, Plaintiff Valdez sought help for his worsening infection from personnel of the Denver Detention Center and/or Denver Health including, but not limited to Defendants Klotz, Lindsey, Dranginis, Andrea Johnson, RN, Stephanie Montoya, LPN, Lindsay Yager, LPN, Tamatha Anding, LPN, and/or Chris Breznay, RN.  Plaintiff's severe medical condition was evident due to swelling in his jaw and down into his neck and chest, discoloration, difficulty speaking and breathing, as well as Plaintiff Valdez's overall presentation as an individual suffering from a serious illness.  By September 18, the pain had become so pronounced that it was causing Plaintiff Valdez to have difficulty moving.

24. Plaintiff Valdez's condition was sufficiently serious that qualified medical personnel would have recognized that it required treatment, and the severity of Plaintiff Valdez's condition was sufficiently obvious that even a layperson would easily recognize the necessity for a doctor's attention.

25. Plaintiff Valdez had a court appearance scheduled for the morning of September 18, which caused him to miss the receipt of his morning medication.

26. When Plaintiff Valdez returned to the Denver Detention Center, he requested to go to medical to obtain his medication and seek treatment for his rapidly deteriorating condition.  Defendant Gareth Stepp was the on-duty housing officer who was responsible for arranging to convey Plaintiff Valdez the medical center for treatment.

27. Shortly after 9:45 a.m. on September 18, 2017, Plaintiff Valdez entered a secured sally port, from which he was to proceed to the medical center.  Once Plaintiff Valdez entered the secured sally port, Defendant Stepp did not allow Plaintiff Valdez to exit and proceed

to the medical clinic.  Instead, Defendant Stepp left Plaintiff Valdez to wait in the sally port for well in excess of a typical wait time, especially for a resident who was in need of immediate medical attention.  While Plaintiff Valdez was in the sally port, waiting to be allowed to proceed to the medical center, Defendant Stepp made personal phone calls on a Detention Center telephone, in violation of Denver Sheriff Department policy, and in callous disregard of Plaintiff Valdez's condition.

28. Plaintiff Valdez returned to his cell.  Shortly thereafter, he began banging on his cell window, requesting permission to go get his medication.  Notwithstanding the lack of any policy, procedure or basis for such a conclusion, Defendant Stepp insisted to Plaintiff Valdez that he had refused his medication.  Plaintiff Valdez, overcome by pain, weakness, nausea, and other symptoms of infection, collapsed down onto the floor.  He then asked his cellmate to contact deputies and request that they declare a medical emergency.

29. One or more of Plaintiff Valdez's cellmates attempted to contact deputies, including Defendant Stepp, to inform them that Plaintiff Valdez's condition was serious and that he required immediate medical attention.

30. In response, Defendant Stepp opened the cell door and ordered Plaintiff Valdez to "get up" and go to medical.  In response, Plaintiff Valdez indicated that he had become too severely ill to reach the medical center under his own power, that he was having trouble breathing, and that he needed assistance to help him get to the medical center.

31. In response, Defendant Stepp became openly hostile to Plaintiff Valdez, began berating him in front of other inmates, and accused him of fabricating and/or exaggerating the

extent of his medical condition.  Among other things, Defendant Stepp accused Plaintiff Valdez of "fucking lying" and being "full of shit" about his medical condition. Defendant Stepp ordered Plaintiff Valdez to "get up" and declared "I am not calling a medical emergency – you can get up."

32. Multiple witnesses heard these comments and reported them to internal affairs investigators who were subsequently called upon to examine Defendant Stepp's conduct.

33. Ultimately, at approximately 10:15 a.m. another deputy called in a medical emergency for Plaintiff Valdez.  Personnel who arrived did not help Plaintiff Valdez to stand up, which forced one of Plaintiff Valdez's cell mates to lift him up and help him into a wheelchair.  Plaintiff Valdez was transported by wheelchair to the medical ward at the Detention Center.

34. Once Plaintiff Valdez arrived in the medical center, he was seen by Defendants Andaya, Stob, Montoya, Klotz, Andrea Johnson, Chris Breznay, R.N. and/or other medical personnel employed by Denver Health and/or the City and County of Denver.  Notes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth.

35. By this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing.  Plaintiff Valdez's complaints were well-documented.  Notwithstanding, officials and medical personnel declined to transport Plaintiff Valdez to Denver Health Medical Center despite Plaintiff

Valdez's repeated requests, severe infection and progressively deteriorating condition. Instead, they simply gave him his morning medication.

36. When Mr. Valdez expressed his belief that emergent treatment was necessary, Denver Detention Center officials ordered him back to his cell.  Mr. Valdez indicated that he could not return to his cell under his own power.  In response, Defendants Klotz, Montoya and/or other medical personnel accused Mr. Valdez of exaggerating, or "faking," his symptoms, and refused to provide Plaintiff Valdez with a wheelchair so that he could return to his cell safely.

37. Instead, Plaintiff Valdez was placed into a holding cell for an extended period of time before ultimately returning to his cell.

38. Several hours later, at approximately 4:50 p.m., Deputy Ozell McClain was on duty in Pod 3F.  He reported that Plaintiff Valdez approached his desk at 4:50 p.m. and asked to see medical personnel. Deputy McClain could plainly see what he described as signs of infection in Plaintiff Valdez's jaw line, neck and upper torso.

39. Deputy McClain summoned medical personnel who advised that Valdez had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for Valdez.  Upon information and belief, the medical personnel who refused to provide further treatment to Defendant Valdez include Defendants Andaya, Montoya, Klotz, Andrea Johnson, R.N., Chris Breznay, R.N. and/or other medical personnel employed by Denver Health and/or the City and County of Denver.

40. Plaintiff Valdez continued to refuse to return to his cell and lock down until he received further medical attention. Deputy McClain therefore contacted Defendant Darryn Brown, who responded to Pod 3F along with Defendant James Johnson.

41. Before arriving in Pod 3F, Defendant Brown spoke with Defendant Andrea Johnson, RN, about Plaintiff Valdez. Defendant Andrea Johnson told him that Valdez had recently seen the dentist, had received medication that would take time to take effect, and therefore did not require additional treatment.

42. Defendant Brown, with the agreement and approval of Defendant James Johnson, ordered Plaintiff Valdez to stop seeking medical attention and told Plaintiff Valdez that medical staff had indicated there was nothing more they could do.

43. In response, Plaintiff Valdez indicated that he would not go back to his cell until he received further medical attention. He again requested that Defendant Brown declare a medical emergency and arrange for Plaintiff Valdez to be transported to Denver Health Medical Center.

44. In response, Defendant Brown yelled to the Pod that no one would be allowed their 'out time' until Plaintiff Valdez locked down, in effect placing the entire pod on lockdown. Defendant Brown loudly announced to other residents that Mr. Valdez was responsible for the lockdown, potentially placing Mr. Valdez at risk of retribution by other residents.

45. Defendant Brown later admitted that the tactic of denying other residents recreation time and announcing to the entire pod the identity of the responsible party was a tactic designed to secure compliance by making uncooperative residents fear physical retaliation at the hands of other residents.

46. Other residents responded by telling Defendant Brown and other personnel of the Detention Center that Plaintiff Valdez needed further medical attention. Nevertheless, Plaintiff Valdez, not wanting to inconvenience other residents and fearful of becoming a victim of retaliation and violence, reluctantly returned to his cell and locked down.

47. Plaintiff Valdez continued to ask Deputy McClain for further medical help.

48. After approximately an additional hour-and-a-half, Mr. Valdez was returned to the medical unit. At that time, medical personnel finally determined that transport to Denver Health Medical Center was necessary.

49. At approximately 7:00 p.m., officials finally placed Mr. Valdez in a transport van. Deputy Daniel McCann drove the vehicle to Denver Health Medical Center, accompanied by Deputy John West. Deputies McCann and West declined to place a seat belt or other restraint on Mr. Valdez, who was restrained in the back of the van and unable to fasten his seatbelt on his own. Deputies McCann and West then drove the vehicle roughly to Denver Health Medical Center. Upon arrival, one of the deputies sarcastically quipped, "How was your nap?" to Mr. Valdez, suggesting that the deputies had intentionally made the ride to Denver Health unpleasant and painful.

50. Mr. Valdez was admitted to Denver Health Medical Center on the evening of September 18, 2017, placed in intensive care, and diagnosed with a significant left-side submandibular abscess, resulting in airway deviation. The abscess required surgical intervention and required a multi-day hospital stay.

51. Denver Health personnel who treated Plaintiff Valdez upon admission corroborated the severity of his symptoms. They noted, among other things, that Plaintiff Valdez had a

borderline febrile demeanor, was experiencing tachycardia, had mandibular, had neck and chest swelling, had a compromised airway, was spitting secretions.

52. Mr. Valdez was ultimately discharged on September 22, 2017.

53. Following Mr. Valdez's return to the Denver Detention Center, Detention Center medical personnel failed to properly dress the site of the surgical incision.  As a result, Mr. Valdez developed a deformity on the left side of his face, jaw and neck.  It is believed to be permanent.

54. Officials' delay in properly diagnosing and treating Plaintiff Valdez's condition, as well as officials' deliberate indifference to his condition, resulted in his severe injuries that necessitated emergent treatment and a prolonged hospital stay.

55. As a direct and proximate result of Defendants' acts and omissions, Plaintiff Valdez sustained significant and permanently disabling bodily injuries.

56. As a direct and proximate result of Defendants' acts and omissions, Plaintiff Valdez has incurred medical bills, lost wages and other economic losses, and will continue to incur additional economic damages in the future.

57. As a direct and proximate result of Defendants' acts and omissions Plaintiff Valdez has sustained permanent physical impairment.

58. As a direct and proximate result of Defendants' acts and omissions, Plaintiff Valdez has suffered non-economic damages including, but not limited to, pain and suffering, inconvenience, emotional distress, and a loss of enjoyment of life.

59. The acts or omissions of the various Defendants were within the scope of their official duties and employment.

14

60. The acts or omissions of all Defendants were the legal and proximate cause of Plaintiff Valdez's injuries.

61. Defendants' unconstitutional policies, customs or practices, as described herein, were the legal and proximate cause of Plaintiff Valdez's injuries, damages and losses.

62. The actions of Defendants as described herein intentionally deprived Plaintiff Valdez of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, causing him to suffer damages as more fully set forth herein.

63. Defendants' woefully inadequate treatment of Plaintiff was pursuant to Denver's and Denver Health's customs, policies and/or practices of unlawful conduct, including:

    a. Taking a "wait and see" approach to providing medical care to inmates who are suffering from obvious, serious medical needs that require immediate attention;

    b. Failing to provide care based on automatic assumptions that inmates are lying about, faking, or exaggerating their symptoms;

    c. Failing to provide care due to prioritizing convenience over necessary medical treatment;

    d. Failing to discipline officers and jail medical personnel, or even find the officers and jail medical personnel engaged in wrongdoing, in the face of obvious constitutional violations (thereby ensuring that officers and medical personnel would repeatedly, and customarily, violate the constitutional rights of inmates);

    e. Failing to adequately train their officers and jail medical providers; and

    f. Failing to adequately staff its detention facilities.

15

64. Pursuant to these customs, policies and/or practices Denver deputies and Denver Health nurses delay necessary medical care for inmates, cause them suffering, harm, and irreparable damage. In other words, Denver deputies and Denver Health nurses customarily ignore inmate requests for medical care until it is too late.

65. These customs, policies, and/or practices have caused Denver deputies and Denver Health nurses to provide deliberately indifferent medical care and have resulted in inmate deaths, serious injuries, and unnecessary pain, suffering, humiliation, and emotional trauma.

66. Denver and Denver Health have a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying: (1) their deputies and nurses taking a wait and see approach to providing medical care to inmates who require immediate medical attention, (2) their deputies' and nurses' categorical assumptions that inmates are faking or exaggerating their medical conditions, and (3) failing to provide care due to prioritizing convenience over necessary medical treatment.

67. Denver Health and Denver have, through inadequate supervision, training, and discipline of deputies and nurses, instilled these customs, policies, and/or practices as the standard operating procedure at Denver correctional facilities.

**Denver's and Denver Health's persistent failure to provide even minimal proper healthcare demonstrates their unconstitutional customs, policies and/or practices.**

68. The following examples are emblematic of Denver's and Denver Health's customs, policies, and practices of: (1) taking a "wait and see" approach to providing medical care to inmates who are suffering from obvious, serious medical needs that require immediate attention; (2) failing to provide care based on automatic assumptions that inmates are

16

lying about, faking, or exaggerating, their symptoms; (3) failing to provide care due to prioritizing convenience over necessary medical treatment. These customs, policies, and practices are caused, in whole or at the very least in part, by Denver and Denver Health's failure adequately train or to discipline officers and nurses, or even find them to have engaged in wrongdoing, in the face of obvious constitutional violations.

69. On July 31, 2018, at 10:44 a.m., Diana Sanchez was forced to deliver her baby on a cold, hard bench, feet away from a toilet, in a jail cell at the Denver County Jail, all alone and with no medical supervision or treatment. Ms. Sanchez had to endure this horrific experience despite the fact that multiple Denver Health nurses and Denver jail staff knew that: (1) she had been in active labor for hours, (2) she was days away from her due date, and (3) her water had broken hours before. Instead of ensuring that Ms. Sanchez was able to give birth in a safe and sanitary medical setting, Denver Health nurses and Denver Sheriff deputies callously made her labor alone for hours, and ultimately give birth alone in a dirty jail cell without any medical care, because it was *inconvenient* to take her to the hospital during the jail's booking process. Once Ms. Sanchez's baby arrived, jail medical staff was totally unequipped to care for him.

70. In November 2015, Denver deputies and Denver Health medical care providers were deliberately indifferent to the serious medical needs of Michael Marshall. Mr. Marshall was arrested and booked at Van Cise-Simonet Detention Center in Denver for the minor, non-violent offense of trespassing. He was held on just $100 bond. Mr. Marshall was homeless, 50 years old, 5'4'' tall, and weighed just 112 pounds at the time. On the evening of November 11, 2015, while Mr. Marshall was suffering from a non-violent

17

mental health crisis, Denver deputies responded by forcibly restraining him, violently flinging him to a bench, wrenching his hands behind his back, throwing him face-down on the concrete floor, clamping an OPN on his ankle so tightly as to break the device, and suffocating him under the weight of hundreds of pounds of deputies. As Mr. Marshall choked and aspirated on his own vomit and lost consciousness, Denver deputies and sergeants, and Denver Health nurses refused to provide him life-saving medical care, and instead strapped Michael Marshall's limp body into a restraint chair and further restricted his breathing with a spit mask. Mr. Marshall was eventually taken to Denver Health Hospital, where he died because of Denver Sheriff's excessive force and Denver Sheriffs' and Denver Health nurses' failure to provide him with the medical care that he so obviously and desperately needed. Only a few of the involved Denver Sheriffs were disciplined in any way, and they received brief suspensions. In its decision reversing the suspensions of the two deputies, the City's Career Services Board Hearing officer noted that they City's own internal investigation had recommended that no discipline be imposed. One of the most culpable officers quit in order to avoid discipline, and was subsequently hired as a Denver Police Officer. Denver, incredibly, did not have an on-duty mental health care provider at the jail at the time of Mr. Marshall's death, despite knowing that approximately half of the detainees in Denver detention centers suffer from mental illness, and that jail staff were likely to encounter those suffering from mental illness regularly and in the ordinary course of carrying out their responsibilities. Denver and Denver Health settled Mr. Marshall's claims for $5.3 million.

71. In October 2014, Denver deputies and Denver Health medical care providers were deliberately indifferent to the serious medical needs of George Moore. Mr. Moore was arrested on October 9, 2014 and brought to intake at the Denver City Jail. During intake, Mr. Moore met with Denver Health Nurse Zimmer and informed her that he needed a cane or walker because of his stability issues. He further informed Nurse Zimmer that he was in tremendous pain standing up, sitting down, and walking, and that he was disabled as defined in Title II of the Americans with Disabilities Act. Nurse Zimmer told Mr. Moore she did not have time to verify his request because she had forty other inmates to deal with and that he'd have to "deal with it" upstairs on the floor where he'd be staying. Mr. Moore asked to see Nurse Zimmer's supervisor, but Nurse Zimmer responded that her supervisor would also tell him to address his concerns upstairs. When Mr. Moore was moved upstairs that evening, a deputy informed him that medical was closed and he would not be allowed to see them at that time. The next day, Mr. Moore's left hip gave out and he collapsed to the floor, causing additional pain to his hip, groin, and lower back. Denver Health medical staff did not provide Mr. Moore with a walker until three hours after he fell. After falling, Mr. Moore consistently requested medical attention for his hip, but was denied any further medical attention until two months later. The doctor he saw outside the jail put in an order for Mr. Moore to get hip surgery, but medical staff at the Denver City Jail refused to schedule Mr. Moore for surgery because he was a pretrial detainee, not serving a sentence. He never received surgery. Upon information and belief, no Denver deputy nor Denver Health nurse was disciplined for their failure to provide constitutional care to Mr. Moore.

72. In July 2012, Denver deputies and Denver Health medical care providers were
deliberately indifferent to the serious medical needs of Rebecca Trujillo. While in the
Denver County Jail, Ms. Trujillo suffered a serious spinal cord injury. Despite exhibiting
obvious, serious signs of a spinal cord injury, including chronic pain, loss of control of
bowel movements, slowed speech, altered gait, and reduced ability to use her hands and
legs, Denver deputies and Denver Health nurses failed to ensure that Ms. Trujillo was
provided with appropriate medical care. Following Ms. Trujillo's release, she received
surgery for her spinal injuries and her surgeon told her that her injuries were exacerbated
by Denver deputies' and Denver Health nurses' failure to ensure she was provided with
appropriate medical treatment. Upon information and belief, no Denver deputy nor
Denver Health nurse was disciplined for their failure to provide constitutional care to Ms.
Trujillo.

73. On July 9, 2010, Denver deputies and Denver Health medical care providers were
deliberately indifferent to the serious medical needs of Marvin Booker. Mr. Booker was
killed in the City and County of Denver's Van Cise-Simonet Detention Center, after five
Denver Sheriff's Department Deputies piled on top of him and implemented multiple use
of force techniques on him simultaneously. The types of force used on Mr. Booker
included a carotid restraint (or "sleeper hold") on his neck, a Taser to his back, handcuffs
of his arms behind his back, and nunchucks to restrain his legs and feet. Mr. Booker was
56 years old, weighed only 135 pounds, and stood 5'5" tall. Two Denver Health nurses
witnessed much of the deputies' interaction with Mr. Booker, including the use of the
carotid chokehold and the Taser, but left the scene during the physical restraint in order to

20

attend to some unrelated paperwork. The nurses had to be summoned three times before they were willing to provide any medical assistance whatsoever to Mr. Booker. At least one nurse testified that Mr. Booker was "acting like" he was unconscious, and another nurse stated in her IAB interview that inmates pretend like they are unresponsive in order to get attention. None of the Denver deputies or nurses involved in the death of Mr. Booker was disciplined for the failure to provide constitutional care to Mr. Booker. A jury returned a verdict of $4.65 million, finding that Denver deputies had violated Mr. Booker's constitutional rights. Prior to trial, Denver stipulated to *Monell* liability and Denver Health settled claims against it.

74. In 2008, Denver deputies and Denver Health medical care providers were deliberately indifferent to the obvious, serious medical needs of Timothy Thomason. Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking massive amounts of pain killers and anxiety medications. The officers assured him that they would bring his medications to the jail. Once he arrived at the Pre-Arraignment Detention Facility, however, Denver sheriffs ignored his repeated pleas for medication. A judge ordered his release, but Denver forced him to spend several more hours in jail, without his medication, until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason alleged that his treatment by the Denver Sheriff's Department violated his constitutional rights. Denver paid $150,000 to settle Mr. Thomason's claims.

75. These cases provide only representative examples of the rampant deliberate indifference to serious medical needs by Denver law enforcement officer sand Denver Health nurses, and the lack of adequate training or supervision on the part of the Denver and Denver Health to prevent these dangerous and unlawful patterns of conduct.

76. The lawsuits and other incidents involving deliberate indifference to serious medical needs and coverups identified above are illustrative of the culture and customs, policies, and practices that existed during the incident outlined in this Amended Complaint, were the result of Denver's and Denver Health's conscious and deliberate policy choices, and were the moving force behind the injuries inflicted on Plaintiff in this case.

**Defendant Denver hasa culture of disregarding inmate welfare and safety.**

77. The cases set forth above are by no means the only examples of Denver's culture of unconstitutional disregard for inmate wellbeing and safety.

78. In July 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere 40-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller. This incident was not reviewed despite Mr. Hunter's grievance until after the initiation of his lawsuit.

79. In connection with the *Hunter* litigation, Judge Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices

and suggested they were intimidating a key witness, saying that a Denver police investigation "smacks of a sham."

80. Denver agreed as part of the *Hunter* settlement to conduct an external review of the DSD, which would consider the screening and hiring process for DSD deputies; best practices related to the discipline of DSD deputies; and best practices related to the functioning of DSD Internal Affairs Bureau ("IAB"). Unfortunately, this agreement to an external review has not cured Denver's ongoing custom, policies and practices of indifference to inmate safety and welfare.

81. Denver's illegal customs and practices illustrated by the *Hunter* case also existed during the incident outlined in this Amended Complaint, were the result of conscious and deliberate policy choices on the part of Denver, and were the moving force behind the injuries Plaintiff suffered.

**<u>Defendant Denver has a culture of preventing guards from ensuring that inmates are provided appropriate medical care for serious medical needs, that are obvious even to a layperson, past notifying a nurse, and then blaming Denver Health when medical care is not provided.</u>**

82. The cases set forth above are by no means the only examples of Denver's culture of unconstitutional disregard for inmate wellbeing and safety.

83. In 2008, Denver deputies and Denver Health medical care providers were deliberately indifferent to the obvious, serious medical needs of Emily Rae Rice. Ms. Rice was involved in a car accident prior to being booked into the Denver Jail. While in the Jail, Ms. Rice begged the Denver deputies and Denver Health nurses to provide her with medical care. They continually refused to provide any care whatsoever. Ms. Rice ultimately died of internal hemorrhages, which were completely treatable had the

deputies or nurses responded to Ms. Rice's pleas. After Ms. Rice's death, Denver

destroyed, or otherwise tampered with, video and other evidence, and engaged in a cover-

up of the wrongdoing. After initially denying any liability on any of the claims, Denver

and Denver Health paid a total of $7 million and agreed to many policy and training

changes, which apparently were not wholly fulfilled. An investigation conducted by the

Colorado Department of Public Health and Environment cited Denver Health for its

mistreatment of Ms. Rice, the agency found that Denver Health engaged in "patient

dumping" when it discharged Ms. Rice without providing any medical care.

84. As part of a negotiated settlement of legal claims arising from Ms. Rice's death, Denver

committed to implementing a series of policy changes called "Emily's Protocols." One

protocol specifically required:

> The determination to transport any individual to an area hospital from the jails
> without specific instructions by medical staff is reserved to Sergeants and higher
> ranks. Accordingly, department orders shall provide that all corrections staff be
> trained that they must alert a supervisor if they believe from a lay person's
> perspective that an inmate requires additional medical attention from the jail
> medical staff. If supervisors believe that an inmate requires additional medical
> attention, they are to take reasonable steps to resolve conflicts with medical
> concerns, including making direct calls to the on-call physician and/or utilizing 911
> services to transport persons to area hospitals. If supervisory staff continue to
> believe that an inmate requires additional medical attention for a serious medical
> need, supervisory staff must alert a Division Chief.

85. This protocol was negotiated because Denver deputies and sergeants in Ms. Rice's case

abjectly failed to ensure she was provided appropriate medical care, which resulted in her

death, and blamed their failure to do so on a rigid customary hierarchy at the jail, which

they claimed forbid them from elevating inmate medical concerns to a higher-level if

they had already contacted a nurse. In other words, it was custom, policy, and practice at

the Denver Jail at the time, and continues to be to this day, that, even if it is obvious to jail staff that an inmate requires medical attention, jail staff will not take any steps to ensure inmates are provided medical attention above notifying the on-duty nurse at the jail.

86. Emily's Protocols were designed by counsel in her case to address specific failings by Denver deputies and sheriffs in Ms. Rice's case.  Denver has failed to implement these protocols despite being on notice that a deficiency in their customs, policies, and practices existed over *ten years ago*

87. Denver's illegal customs and practices illustrated by the *Rice* case also existed during the incident outlined in this Amended Complaint, were the result of Denver's conscious and deliberate policy choices, and were the moving force behind the injuries Plaintiff suffered.

**The Office Of The Independent Monitor's 2013 Report Demonstrates DSD's Custom, Practice, and Policy Of Failing To Discipline Its Employees, Which Has Led To Continued Failure To Provide Adequate Medical Care**

88. In 2013, Denver's Office of Independent Monitor (OIM) filed a six-chapter report critiquing procedures within the Denver Police Department (DPD) and the Denver Sheriff's Department (DSD). Chapter two of the report detailed deficiencies in the manner in which the DSD handled prisoners' most serious grievances.

89. The OIM analyzed more than 6,000 prisoners' grievances filed over the two- and half-year period of January 1, 2011 through June 30, 2013. Its focus was on grievances that alleged serious misconduct by guards. Both public policy and DSD directives dictate that serious misconduct committed by guards is to be reported to and investigated by the

Internal Affairs Bureau (IAB). The OIM found that over 90% of the most serious grievances never made it to the IAB for investigation.

90. Of the fifty-four grievances alleging serious misconduct by guards only nine were actually investigated by the IAB and of the nine only three were actually triggered by the original grievance. The other six were only investigated after the prisoner filed a separate complaint.

91. Another problem identified by the OIM is that DSD policy requires a verbal resolution be attempted before a prisoner can file a written grievance. According to the report this limitation has the effect of discouraging prisoners from using the grievance process.

92. The investigation revealed that the Inmate Handbook did not inform prisoners that an informal resolution was not required if their grievance alleges serious misconduct by a guard. The OIM also found that DSD's policy of rejecting grievances for procedural errors when a guard is accused of serious misconduct was extremely problematic, and led to allegations of serious misconduct going uninvestigated.

93. Interviews with employees revealed that guards consistently failed to file reports of serious misconduct with the IAB. When asked for a reason, guards referred to a memo, issued from an unknown source, that required them to first go to their supervisor. The OIM was never able to locate the memo.

94. The OIM also found that DSD customarily failed to analyze the data supplied by the grievances themselves and, therefore, failed to adequately supervise and discipline its employees based on the aggregate data.

**<u>Independent analysts: Denver fails to properly supervise DSD deputies and properly staff its facilities.</u>**

95. On August 21, 2014, the DSD Training Task Force released its recommendations, which included: "Add more sergeants to improve the span of control and improve supervision of deputies while on duty."

96. The recommendations referenced the following shortcoming within DSD: "Current span of control exceeds best practice of one supervisor for every 3-7 subordinates. Current ratio is 1:9.24" (emphasis in original).

97. Independent Monitor Nick Mitchell stated that "many DDC sergeants spend the bulk of their shifts completing paperwork and managing each jail floor's staffing roster, instead of supervising deputies."

98. IM Mitchell's letter continued: "DDC deputies with whom we spoke corroborated that supervision is often absent in the DDC . . . ."

99. Similarly, the Hillard Heintze report noted: "Many deputies indicated that they did not have regular contact with their supervisors during their shifts . . . ."

100.     The report recommended that "DSD supervisors, in general, need to place a much higher priority on supervising employees and holding them accountable for their duties."

101.     In his letter, IM Mitchell concluded: "These supervisory gaps at the DDC, and the perception by deputies that they are not being supervised, reducing mentoring of deputies, diminish opportunities for the early identification of deputy performance problems, and create conditions that could foster misconduct."

102.     He recommended, among other things, "that the DSD review and enhance the training provided to new sergeants to ensure that it thoroughly prepares them to supervise

deputies, and make available additional resources that will enable sergeants to be more effective at providing supervision . . . ."

103.     The DSD's October 31, 2014 Phase One Status Report for the DSD Reform Effort confirmed the findings of the Training Task Force and the Office of the Independent Monitor ("OIM"):

> As inmate populations have trended higher, the Department has experienced staffing shortages. Deputies work long hours — as many as 16 hours at a time — and are supervising up to 64 inmates . . . . Deputies often work alone at their posts. Their supervisors, Sergeants, are often required to spend much of their time conducting administrative work due to understaffing. The Department also is working to address a shortage of sergeants. Best practice is for each sergeant to supervise three to seven deputies and the current ratio is 1:9.

104.     In its March 2015 report, the Auditor also noted DSD's significant problem of overworking deputies and understaffing its jails.

105.     A 2014 assessment conducted by the City's Office of Human Resources ("OHR") found that the average DSD employee worked approximately twenty-four hours of mandatory overtime each week. According to the OHR report, when deputy sheriffs are required to work overtime after completing a twelve-hour shift, the effects of individual stress and fatigue may lead to "inappropriate behavior, bad decisions, and wrong choices on and off the job, resulting in potential disciplinary problems."

106.     The Auditor further found that a flawed staffing methodology resulted in consistent understaffing within DSD.

107.     The DSD Training Task Force's recommendations included changing shifts from 12 hours to 10 hours, changing the employee break structure, and training deputies on anger/stress management.

108.    The policy failings identified above, including but not limited Denver's

inadequate training, supervision, and discipline of its law enforcement officers, were the

result of Denver's conscious and deliberate choices, existed at the time of the incident

outlined in this Amended Complaint, and were the moving force behind the injuries Plaintiff

suffered.

109.    Denver's conscious and deliberate choices, existed at the time of the incident

outlined in this Amended Complaint, and were the moving force behind the injuries

Plaintiff suffered.

**Independent analysts: Delays and backlog at Internal Affairs have compounded DSD's lack of accountability**

110.    In his September 10, 2014 letter to Councilman Lopez, IM Mitchell stated with

regard to Internal Affairs investigations:

> For several years, the OIM has registered its concern that it has taken too long for
> investigations into alleged deputy misconduct to be completed. As has recently
> been reported in the print media, the caseload and backlog in DSD Internal
> Affairs is growing, which is cause for additional concern. The lengthy timeline for
> investigating and resolving jail misconduct complaints at present is unacceptable
> for accused deputies, for the public, and for the investigators in DSD Internal
> Affairs who are working hard under challenging conditions.

111.    In its 2012 Annual Report, OIM had noted that increasing delays in completing

internal affairs investigations "may prevent [the] department from acting quickly to

correct or deter deputy misconduct, may lower morale, and tend[] to undermine public

and department trust in the complaint process."

112.    On October 2, 2014, the DSD Discipline Task Force, which included Interim

Sheriff Diggins, former Sheriff Wilson, and former Manager of Safety Al LaCabe, issued

32 recommendations, one of which identified "a need to increase the quality and speed of the DSD Internal Affairs process, giving priority to those cases in which inappropriate force, other inmate treatment issues, or deceptive conduct is alleged."

113.     In the fall of 2014, the DSD attempted to address the backlog of cases and increase the efficiency of IAB case by hiring retired Arapahoe County Sheriff Grayson Robinson to lead its IAB on an interim basis, in addition to six on-call investigators.

114.     The DSD also announced that it had created a new office, the Conduct Review Office, to increase the efficiency of reviewing discipline cases and to shorten the disciplinary process overall.

115.     Instead of improving the disciplinary review process, DSD worsened it. The report observed that the complaint handling process slowed down in 2014 compared to 2013. And, this signaled to DSD employees that there would be no consequences for their actions.

116.     The OIG Group report noted that as DSD "sought to handle the 45 old grievances that had not been properly investigated or reviewed, the caseload at IA grew, contributing to an already existing backlog of overdue cases that was the result of years of inadequate resources, internal leadership failures, and the lack of an effective system for monitoring investigations."

117.     The OIG Group report noted that "unlike many jurisdictions, Denver does not have a statute setting a limitations period on disciplinary actions against peace officers. As a result, there is no external deadline on when an investigation must be completed or discipline imposed."

118.     The OIR Group anecdotally "heard about cases languishing months and years with no work being done toward completion as investigators got overburdened and fell behind on their cases."

119.     For example, "[i]n 2014, Internal Affairs discovered over 100 informal complaints that had been languishing at the division level well past the 180-day deadline set by Department policy, and then learned that these investigations had been incorrectly assigned, so that some did not even know they were supposed to be working on them and they were essentially lost in the system."

120.     The OIR Group report concluded:

These sorts of delays undermine the purpose of a disciplinary system – to maintain the integrity of the agency while holding people accountable for their actions They likewise erode the public's trust in the Department's ability to police itself and weaken deputies' confidence in their leaders. When an agency imposes discipline years after an incident, it leaves one to question how seriously the agency takes the misconduct and diminishes the important of the disciplinary action, in that the lessons that should be learned from the incident have long since faded in memories.

121.     The policy failings identified above, including but not limited Denver's inadequate training, supervision, and discipline of its law enforcement officers, were the result of Denver's conscious and deliberate choices, existed at the time of the incident outlined in this Amended Complaint, and were the moving force behind the injuries Plaintiff suffered.

**The OIM's Report On The Death Of Michael Marshall Demonstrates DSD's Custom, Practice, and Policy Of Failing To Discipline Its Employees, Which Has Led To Continued Failure To Ensure Inmate Safety and to Provide Adequate Medical Care**

122.     On March 19, 2018 (a few months after the events giving rise to this litigation), the OIM released a report entitled The Death of Michael Marshal, an Independent

31

Review. In that report, the OIM found that the Denver IAB grossly mishandled its investigation into the circumstances surrounding Mr. Marshall's death. The OIM found that the IAB submitted the case to the OIM as a completed investigation despite the fact that it had not interviewed any of the deputies involved in Mr. Marshall's death. Additionally, during the IAB interviews of the nurses who failed to provide medical care to Mr. Marshall, the IAB investigators did not utilize critical evidence, including the video of the incident. The OIM concluded that when the IAB claimed it had concluded its investigation, it had abjectly failed to gather all, or even most, or the relevant facts necessary for resolution of the allegations.

123.    After IAB summarily closed the case without so much as investigating it, the OIM supplied IAB with substantial evidence of misconduct by both deputies and nurses in their mistreatment of Mr. Marshall. The information that IAB had in its possession at this time included the medical examiner's conclusion that Mr. Marshall had died of, among other things, complications from positional asphyxia due to physical restraint in a prone position, video showing one of the deputies applying pressure to Mr. Marshall's body for an extended period of time after he had already gone limp and vomited while retrained in handcuffs, leg irons, and by body weight, a statement by one of the nurses that she asked the deputy to relieve some of the pressure on Mr. Marshall's limp body and he refused, and substantial evidence that the supervisor on scene witnessed excessive force being used and failed to intervene to prevent the inappropriate use of force.

124.    Despite being in possession of this information, IAB took no further steps to investigate and closed the investigation without further review.

125.    The OIM also found that the Department of Safety ("DOS") abjectly failed to properly and appropriately discipline those involved in the killing of Mr. Marshall. The OIM found that the DOS failed to discipline three on-scene supervisors who watched their subordinates use grossly excessive force without so much as questioning the force used. Further, the OIM found that the discipline given to a deputy who used the force that killed Mr. Marshall was woefully inadequate, and that the discipline imposed did not reflect the severity of the force used.

126.    The OIM found that the DOS had failed to adequately train its deputies. Specifically, it found that the DSD had failed to provide adequate training on the medical condition excited delirium.

127.    The OIM also found that DSD's policies inadequate as they related to resolving urgent medical and safety concerns that are in conflict. In other words, DSD's policies and training for situations where security concerns and medical concerns in correctional settings conflict were inadequate.

128.    Finally, the OIM found that DSD fails to learn from its past mistakes, and that there is a custom, policy, and practice of minimizing past mistakes and not using those mistakes as an opportunity to correct culture and issues within the DSD. Specifically, the OIM pointed to the fact that, while the criminal investigation was still underway, a deputy who had used the force that killed Mr. Marshall was nominated by his supervisor for DSD's Life Saving Award. The OIM noted that the deputy had been nominated for this award even though Mr. Marshall had died. Importantly, the OIM noted that a DSD

trainer (and many others within DSD) continued to believe that the deputies and nurses had acted appropriately and in compliance with DSD policies while killing Mr. Marshall.

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983: Deliberately Indifferent Medical Care
(Against All Defendants)

129.     Plaintiff hereby incorporates all other paragraphs of this Amended Complaint as if fully set forth herein.

130.     Plaintiff Valdez was a citizen of the United States, and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

131.     Plaintiff Valdez was a pre-trial detainee.

132.     As a pre-trial detainee, Plaintiff Valdez was protected from deliberate indifference to his serious medical needs by the Fourteenth Amendment.

133.     Under the Fourteenth Amendment, Plaintiff Valdez was also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear objectively excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

134.     To the extent Plaintiff Valdez was under any conviction, Plaintiff Valdez was also protected from deliberate indifference to his serious medical needs by the Eighth amendment.

135.     Each Defendant knew or should have known of these clearly established rights at the time of the events described in this Amended Complaint.

136.     Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

34

137.     Defendants knew of and disregarded the excessive risks associated with Plaintiff Valdez's serious medical conditions and nonetheless, with deliberate indifference, elected not to perform a sufficient medical evaluation or provide Plaintiff Valdez with necessary, urgently needed medical care. They did so despite being expressly aware of Plaintiff Valdez's serious medical needs, obvious need for the same, and recklessly disregarding a substantial risk of physical harm to Plaintiff Valdez.

138.     When Plaintiff Valdez, and others acting on his behalf, alerted each individual Defendant to his need for medical assistance, Defendants acted with deliberate indifference to both Plaintiff's readily apparent need for medical attention and Plaintiff's constitutional rights by refusing to obtain and provide medical treatment.

139.     All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

140.     The acts or omissions of each Defendant were the legal and proximate cause of Plaintiff Valdez's injuries.

141.     At all times relevant to the allegations in this Amended Complaint, Denver and its officials were acting under color of state law and had a non-delegable duty to provide constitutionality adequate medical care for inmates.

142.     At all times relevant hereto Denver Health was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

143.     The intentional acts or omissions of Denver and Denver Health were conducted within the scope of their official duties and employment.

144.     Denver Health's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding provision of constitutionally adequate medical care as described were the moving and proximate cause of Plaintiff's injuries.

145.     Denver and Denver Health deliberately indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at the Denver County Jail.

146.     The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Plaintiff and the public.

147.     Denver's and Denver Health's deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Plaintiff's constitutional rights.

148.     The intentional actions and inaction of each individual Defendant, and policies, customs, and practices of Denver and Denver Health as described herein were also moving forces in and proximate causes of the deprivation of Plaintiff's rights to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiff other damages.

149.     Denver is also directly liable for its own policies and actions that are moving forces in this constitutional injury under the contract between Denver and Denver Health, as Denver participated in negotiating and sponsoring this contract despite the knowledge of Denver Health's pervasive pattern of civil rights and human rights violations.

150.     As a direct result of Defendants' unlawful conduct, Plaintiff Valdez suffered

extreme physical and mental pain and suffering.

151.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-

judgment interest, and costs as allowable by law.

152.     In addition to compensatory, economic, consequential and special damages,

Plaintiff is entitled to punitive damages against individual Defendants, in that the actions

were taken maliciously, willfully or with a reckless or wanton disregard of the

constitutional rights of Plaintiff Valdez.

### SECOND CLAIM FOR RELIEF
42 U.S.C. § 1983 – Municipal Liability
(Against Defendants Denver Health; City & County of Denver)

153.     Plaintiff hereby incorporates all other allegations in this Amended Complaint as

though fully alleged herein.

154.     Defendants, City and County of Denver and Denver Health, establishes policies,

procedures, customs and/or practices for Denver Health and Denver Sheriff's Department

employees.  These Defendants responsible, in accordance with established customs,

policies and procedures, for the training and supervision of employees of City & County

of Denver and Denver Health, including but not limited to the individual Defendants

identified in this Amended Complaint.

155.     Defendants developed and maintained customs, policies and procedures, or failed

to develop such practices, including, but not limited inadequate training, supervision

and/or discipline.  Defendants thereby exhibited a deliberate indifference to the

Constitutional rights of persons in the City and County of Denver and the Denver

Detention Center, proximately causing the violation of Plaintiff Valdez's Constitutional rights, as previously described herein.

156.    Defendants' inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

157.    In light of the duties and responsibilities of personnel of Defendants, the need for specialized training, supervision and discipline is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendants are liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

158.    Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of the violation of Plaintiff Valdez's constitutional rights, and constitutes an unconstitutional policy, procedure, custom, and/or practice.

159.    Defendants' failure to train and/or supervise, as described herein, was a legal and proximate cause of Plaintiff's injuries.

160.    As a result of Defendants' conduct, Plaintiff has suffered injuries, damages and losses in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
Negligence
(Against Defendants City and County of Denver; Denver Health; Klotz; Montoya; Andaya; Dranginis; Lindsey; Yager; Anding; Andrea Johnson; Breznay)

161.    Plaintiff incorporates all other paragraphs set forth in this Amended Complaint as if fully set forth herein.

162.      The Denver Detention Center is a "jail" or "correctional facility" as those terms are defined in § 24-10-106, C.R.S.

163.      Under Colo. Rev. Stat. § 24-10-106(1)(b), Denver and Denver Health were required to provide Plaintiff "medical care necessary for basic health." *Nieto v. State*, 952 P.2d 834, 839 (Colo. App. 1997). Denver and Denver Health owed a duty to Plaintiff to house him "in a safe and effective manner." *Nieto*, 952 P.2d at 839; *see also Pack v. Arkansas Valley Correctional Facility*, 894 P.2d 34, 37 (Colo. App. 1995); *Howard v. City & County of Denver*, 837 P.2d 255, 257 (Colo. App. 1992) ("duties in keeping jail are to receive and safely detain every person duly committed therein"). Under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

164.      Defendants owed duties to use reasonable care in the operation of the Denver Detention Center.  Such duties included, but were not limited to, a duty to provide safe accommodations for residents, a duty to protect residents from foreseeable hazards and risks, and a duty to provide appropriate, competent medical care that complied with applicable standards of care.

165.      Defendants breached their duty of reasonable care by, *inter alia*, failing to provide appropriate, competent medical care to Plaintiff Valdez as described elsewhere in this Amended Complaint, and by failing to respond appropriately to Plaintiff's Valdez's serious and worsening medical condition.

166.    Defendants' acts and omissions were the cause-in-fact and proximate cause of the injuries suffered by Plaintiff Valdez as described elsewhere in this Amended Complaint.

## FOURTH CLAIM FOR RELIEF
Negligent Training and Supervision
(Against Defendants City & County of Denver; Denver Health)

167.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

168.    Denver and Denver Health had a duty to exercise reasonable care in the training and supervision of their employees in a manner that provided the detainees under their care with reasonable medical care and treatment.

169.    Denver and Denver Health breached their duty to exercise reasonable care in the training and supervision of their subordinate employees.

170.    Denver and Denver Health, because they knew or should have known of the lack of supervision, experience and training among their employees, also had reason to know that its employees were likely to harm Denver County Jail detainees in need of medical care, including Plaintiffs.

171.    In failing to exercise reasonable care in the training and supervision of their employees relative to their providing reasonable medical care and treatment, Denver and Denver Health were negligent.

172.    The negligence of Denver and Denver Health proximately caused Plaintiff significant physical and mental pain and suffering and other damages.

## FIFTH CLAIM FOR RELIEF
*Respondeat Superior*
(Against Defendants City & County of Denver and Denver Health)

173.     Plaintiff incorporates all other paragraphs set forth in this Amended Complaint as if fully set forth herein.

174.     At all relevant times, employees and/or agents of the City and County of Denver and Denver Health were responsible for supervising the Denver Detention Center and/or for providing medical care to residents.

175.     The City and County of Denver and Denver Health are legally responsible for the negligent acts and/or omissions of these personnel, whether or not such personnel are individually named as Defendants in this Amended Complaint.

**WHEREFORE**, Plaintiff, Frederico Gilbert Valdez III, prays for judgment against Defendants for damages in an amount to be determined at trial, interest as provided by law, costs, expert witness fees, attorney's fees under 42 U.S.C. § 1988, injunctive relief, and such other and further relief as this Court deems proper and fitting.

**PLAINTIFF REQUESTS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

RESPECTFULLY SUBMITTED this 30th day of January 2020.

/s/ *John F. Poor*

_____

John F. Poor, Esq. (#40395)
Heideman Poor LLC
695 South Colorado Blvd., Suite 480
Denver, Colorado 80246
Telephone: 303-975-6363
Fax: 303-484-3524
Email: John@justlawcolorado.com
Attorneys for Plaintiff