IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03520-KLM

FREDERICO GILBERT VALDEZ III, an individual,

     Plaintiff,

v.

THE CITY AND COUNTY OF DENVER,
DENVER HEALTH AND HOSPITAL AUTHORITY, doing business as Denver Health
Medical Center,
GARETH STEPP, in his individual capacity,
DARRYN BROWN, in his individual capacity,
JAMES JOHNSON, in his individual capacity,
CHRISTIAN STOB, in his individual capacity,
DAVID KLOTZ, in his individual capacity,
STEPHANIE MONTOYA, in her individual capacity,
KIMI ANDAYA, in her individual capacity,
EMILY DRANGINIS, in her individual capacity,
LORETTA LINDSEY, in her individual capacity,
LINDSAY YAGER, in her individual capacity,
TAMATHA ANDING, in her individual capacity,
ANDREA JOHNSON, in her individual capacity,
CHRIS BREZNAY, in his individual capacity,

     Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the Medical Defendants' **Motion to Dismiss**

**Amended Complaint & Jury Demand** [#45],[1] on the Denver Defendants' **Motion to**

**Dismiss** [#48], and on Defendant Gareth Stepp's ("Stepp") **Motion to Dismiss** [#75].

_____

[1] "[#45]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). The Court uses this convention throughout this Order.

Plaintiff filed Responses [#59, #60, #79] in opposition to the Motions, and Defendants filed Replies [#69, #70, #82].  The Court has reviewed the Motions, the Responses, the Replies, the entire docket, and the applicable law, and is sufficiently advised in the premises.[2]  For the reasons set forth below, the Motions [#45, #48, #75] are **GRANTED**.

## I. Background[3]

Plaintiff was housed in Pod 3F of the Van Cise-Simonet Detention Center (the "Detention Center") as a pre-trial detainee at the time of the events underlying this lawsuit. *Am. Compl.* [#38] ¶ 14.  On September 14, 2017, Defendant Kimi Andaya, DDS ("Andaya"), assisted by Defendant Lindsay Yager ("Yager"), extracted Plaintiff's number 17 tooth, the third molar on the lower left side of his mouth.  *Id.* ¶ 15.  During the procedure, Defendants Andaya and/or Yager noted that there was perio involvement, i.e., inflammation of the gum around the tooth, likely due to infection.  *Id.* ¶ 16.  Lower wisdom teeth like the number 17 molar are located near certain anatomical spaces which can permit infection to spread down the neck and potentially compromise the person's ability to breathe.  *Id.* ¶ 17. However, Plaintiff was not given antibiotics before, during, or anytime on the day of the extraction procedure.  *Id.* ¶ 16.

On September 15, the day after the extraction procedure, Plaintiff began experiencing significant pain and observed a lump developing on the left side of his neck, suggesting the onset of a serious infection and abscess.  *Id.* ¶ 18.  In addition, he was also

---

[2]   This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#41, #43].

[3]   The Court accepts all well-pled allegations of the Amended Complaint [#38] as true and construes them in the light most favorable to Plaintiff, the non-movant.  *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991).

having significant problems swallowing food and liquid, and he had begun tasting indications of infection in his mouth. *Id.* He promptly reported his symptoms to medical personnel, including Defendant Loretta Lindsey, RN ("Lindsey") and/or Defendant Emily Dranginis, P.A. ("Dranginis"), one or both of whom prescribed a course of penicillin but did not seek to provide emergency treatment or ensure that Plaintiff was examined by a medical doctor. *Id.* ¶ 19. During the following days, Plaintiff was not consistently provided with this medication, although it is not alleged whose specific responsibility that was. *Id.*

By September 16, the lump had roughly doubled in size, and Plaintiff continued to endure increasingly significant pain. *Id.* ¶¶ 20-21. He repeatedly used the "kite" system to report his symptoms to medical staff at the Detention Center. At approximately 5:36 p.m. that day, Defendant David Klotz, LPN, ("Klotz") and Defendant Lindsey examined Plaintiff, at which time Defendant Klotz noted that Plaintiff reported experiencing pain, swelling, and difficulty breathing following his tooth removal. *Id.* ¶ 21. Defendant Lindsey noted that Plaintiff's left jaw was swollen and that his throat appeared less swollen than it had the previous day. *Id.* Notwithstanding Plaintiff's ongoing complaints of steadily worsening symptoms and pain, Defendants Klotz and Lindsey simply provided Plaintiff Valdez with a bag of ice, told him that his symptoms were normal following a tooth extraction, and sent him back to his cell. *Id.*

On September 17, Plaintiff continued to suffer from sharp pains in his face, neck, and chest, and the lump on the left side of his neck had grown to roughly three times its original size. *Id.* ¶ 22. He again reported his symptoms to medical personnel, and he was once again given a bag of ice and returned to his cell without further treatment. *Id.*

By September 18, now four days after the procedure, the pain had become so

severe that Plaintiff had difficulty moving. *Id.* ¶ 23. That morning, he had a court appearance scheduled, which caused him to miss his morning medication. *Id.* ¶ 25. When he returned to the Detention Center, he requested to go to medical to obtain his missed medication and seek treatment for his deteriorating condition. *Id.* ¶ 26. Shortly after 9:45 a.m., Plaintiff entered a secured sally port, from which he was to proceed to the medical center. *Id.* ¶ 27. Once he entered the sally port, Defendant Stepp, the on-duty housing officer who was responsible for arranging to convey Plaintiff to the medical center for treatment, would not allow Plaintiff to exit and proceed to the clinic. *Id.* ¶¶ 26-27. Instead, Defendant Stepp left Plaintiff to wait in the sally port for an unspecified period well in excess of a typical wait time. *Id.* ¶ 27. Meanwhile, as Plaintiff waited, Defendant Stepp made personal phone calls on a Detention Center telephone, purportedly in violation of Denver Sheriff Department policy. *Id.* ¶ 28. Eventually, Plaintiff returned to his cell, shortly after which he began banging on his cell window, requesting permission to get his medication. *Id.* Perhaps because Plaintiff had returned to his cell, Defendant Stepp insisted that Plaintiff had refused his medication. *Id.*

Overcome by pain, weakness, nausea, and other symptoms of infection, Plaintiff collapsed onto the floor, asking a cell mate to contact deputies and request that they declare a medical emergency. *Id.* One or more of his cell mates attempted to contact deputies, including Defendant Stepp, to inform them that Plaintiff's condition was serious and that he required immediate medical attention. *Id.* ¶ 29. Defendant Stepp arrived, opened the cell door, and ordered Plaintiff to "get up" and go to medical. *Id.* ¶ 30. Plaintiff responded that he had become too severely ill to reach the medical center under his own power, that he was having trouble breathing, and that he needed assistance to help him

get to the medical center. *Id.* Defendant Stepp then became openly hostile toward Plaintiff, berating him in front of other inmates and accusing him of fabricating (saying that Plaintiff was "fucking lying") and/or exaggerating the extent of his medical condition (saying that Plaintiff was "full of shit"). *Id.* ¶ 31. Ultimately, Defendant Stepp declared "I am not calling a medical emergency – you can get up." *Id.*

At approximately 10:15 a.m., another deputy called in a medical emergency for Plaintiff, but the personnel who arrived did not help Plaintiff to stand up, instead forcing one of Plaintiff's cell mates to lift him up and help him into a wheelchair. *Id.* ¶ 33. Plaintiff was then wheeled to the medical ward, where he was seen by Defendants Andaya, Christian Stob ("Stob"), Stephanie Montoya ("Montoya"), Klotz, Andrea Johnson ("A. Johnson"), Chris Breznay, R.N. ("Breznay"), and/or other medical personnel employed by Denver Health and/or the City and County of Denver. *Id.* ¶¶ 33-34. Notes from the visit indicate that Plaintiff suffered from significant throat pain and was unable to open his mouth. *Id.* ¶ 34. His symptoms were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing. *Id.* ¶ 35. Despite these symptoms, officials and medical personnel declined to transport Plaintiff to Denver Health Medical Center despite Plaintiff's repeated requests. *Id.* Rather, they simply gave him his morning medication. *Id.* When Plaintiff expressed his belief that emergency treatment was necessary, Detention Center officials ordered him back to his cell. *Id.* ¶ 36. When Plaintiff indicated that he could not return to his cell under his own power, Defendants Klotz, Montoya, and/or other medical personnel accused Plaintiff of exaggerating or "faking" his symptoms, and they refused to provide him with a wheelchair so that he could return to his cell safely. *Id.* Instead, Plaintiff was placed into a holding cell

for an extended period before ultimately returning to his cell.  *Id.* ¶ 37.

Several hours later that same day, at approximately 4:50 p.m., Deputy Ozell McClain ("McClain"), a non-party, was on duty in Pod 3F when Plaintiff approached his desk and asked to see medical personnel.  *Id.* ¶ 38.  Deputy McClain could plainly see what he described as signs of infection in Plaintiff's jaw line, neck and upper torso.  *Id.*  He summoned medical personnel who advised him that Plaintiff had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for him. *Id.* ¶ 39.  The medical personnel who refused to provide further treatment to Plaintiff included Defendants Andaya, Montoya, Klotz, A. Johnson, Breznay, and/or other medical personnel.  *Id.*  Plaintiff continued to refuse to return to his cell and lock down until he received further medical attention, and Deputy McClain therefore contacted Defendant Darryn Brown ("Brown"), who responded to Pod 3F along with Defendant James Johnson ("J. Johnson"), neither of whom were medical personnel.  *Id.* ¶ 40.

Before coming to Pod 3F, Defendant Brown spoke with Defendant A. Johnson about Plaintiff.  *Id.* ¶ 41.  She told him that Plaintiff had recently seen the dentist, had received medication that would take time to take effect, and did not require additional treatment at that time.  *Id.*  Defendant Brown, with the agreement of Defendant J. Johnson, ordered Plaintiff to stop seeking medical attention and told him that medical staff had indicated that there was nothing more they could do.  *Id.* ¶ 42.  Plaintiff responded that he would not go back to his cell until he received further medical attention, and he again requested that Defendant Brown declare a medical emergency and arrange for Plaintiff to be transported to Denver Health Medical Center.  *Id.* ¶ 43.  Defendant Brown then yelled to the rest of the

pod that no one would be allowed their 'out time' until Plaintiff locked down, in effect placing the entire pod on lock down. *Id.* ¶ 44. Other inmates responded by telling Defendant Brown and other personnel of the Detention Center that Plaintiff needed further medical attention, but, nevertheless, Plaintiff, not wanting to inconvenience other residents and fearful of becoming a victim of retaliation and violence, reluctantly returned to his cell and locked down. *Id.* ¶ 46. However, he continued to ask Deputy McClain for further medical help. *Id.* ¶ 47.

About ninety minutes later, Plaintiff was returned to the medical unit, at which time medical personnel finally determined that transport to Denver Health Medical Center was appropriate. *Id.* ¶ 48. At about 7:00 p.m., officials placed Plaintiff in a transport van, which was driven by Deputy Daniel McCann ("McCann"), a non-party, to Denver Health Medical Center. *Id.* ¶ 49. They were accompanied by Deputy John West ("West"), another non-party, and both deputies declined to place a seat belt on Plaintiff, who was restrained in the back of the van and unable to fasten his seatbelt on his own. *Id.* Deputy McCann then drove the vehicle roughly to Denver Health Medical Center and, on arrival, one of the deputies sarcastically asked Plaintiff, "How was your nap?", which, Plaintiff asserts, suggests that the deputies had intentionally made the ride to Denver Health unpleasant and painful. *Id.*

Plaintiff was admitted to Denver Health Medical Center that evening, placed in intensive care, and diagnosed with a significant left-side submandibular abscess, resulting in airway deviation. *Id.* ¶ 50. The abscess required surgical intervention and required a multi-day hospital stay. *Id.* Treating Denver Health personnel corroborated the severity of his symptoms, noting, among other things, that Plaintiff had a borderline febrile

demeanor, was experiencing tachycardia, had mandibular, neck, and chest swelling, had a compromised airway, and was spitting secretions. *Id.* ¶ 51.

On September 22, 2017, Plaintiff was discharged and returned to the Detention Center, where medical personnel failed to properly dress the site of the surgical incision, causing Plaintiff to develop a deformity on the left side of his face, jaw, and neck, a condition which is believed to be permanent. *Id.* ¶¶ 52-53.

As a result of these allegations, Plaintiff asserts the following claims: (1) a Fourteenth Amendment claim against all Defendants for deliberate indifference to serious medical needs, *id.* ¶¶ 129-152;[4] (2) § 1983 municipal liability against Defendants Denver Health and the City and County of Denver, *id.* ¶¶ 153-160; (3) negligence against Defendants City and County of Denver, Denver Health, Klotz, Montoya, Andaya, Dranginis, Lindsey, Yager, Tamatha Anding ("Anding"), A. Johnson, and Breznay, *id.* ¶¶ 161-166; (4) negligent training and supervision against Defendants City and County of Denver and Denver Health, *id.* ¶¶ 167-172; and (5) respondeat superior against Defendants City and County of Denver and Denver Health, *id.* ¶¶ 173-175. Plaintiff seeks "damages in an amount to be determined at trial, interest as provided by law, costs, expert witness fees, attorney's fees under 42 U.S.C. § 1988, injunctive relief, and such other and further relief as this Court deems proper and fitting," but he does not specify what injunctive relief, if any,

---

[4] In connection with this first claim, Plaintiff also states: "To the extent Plaintiff Valdez was under any conviction, Plaintiff Valdez was also protected from deliberate indifference to his serious medical needs by the Eighth [A]mendment." *Am. Compl.* [#38] ¶ 134. This is the only mention of the Eighth Amendment in the Amended Complaint [#38], and Plaintiff does not argue in his Responses [#59, #60, #79] that the Eighth Amendment applies here. Indeed, Plaintiff affirmatively alleges that he was a pretrial detainee at the time of the events underlying this lawsuit, and therefore the Fourteenth Amendment, not the Eighth Amendment, is the source of his constitutional rights in connection with a deliberate indifference claim. *See Shue v. Laramie Cnty. Det. Ctr.*, 594 F. App'x 941, 945 (10th Cir. 2014).

he actually seeks.  *Id.* at 41.  In the present Motions [#45, #48, #75], Defendants seek dismissal of all claims except for Claim Three for negligence against Defendant Denver Health.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations."  (quoting *Twombly*, 550 U.S. at 570)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor

does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n] [ ] that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 556 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III.  Analysis

"The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). "Under that standard, jail guards [and other officials] cannot act with deliberate indifference to a pretrial detainee's serious medical needs." *Id.*  Whether the plaintiff "received some care does not foreclose the possibility of a deliberate indifference claim, but an individual who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Strain v. Regalado*, 977 F.3d 984, 994 (10th Cir. 2020) (internal citations and quotation marks omitted).

"To establish a violation of this right, a pretrial detainee must satisfy objective and subjective prongs of the test."  *Lance*, 985 F.3d at 793.[5]  "The objective prong is satisfied

---

[5] Plaintiff argues that "[t]his Court should apply an objective deliberate indifference standard under the Fourteenth Amendment" by extending *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015),

if the medical need is sufficiently serious." *Id.* "A medical need is sufficiently serious if a physician directed further treatment after diagnosing the condition or the need for a doctor's attention would be obvious to a lay person." *Id.* "Medical delays can be sufficiently serious if they cause substantial harm, such as permanent loss or considerable pain." *Id.* (internal quotation marks and brackets omitted).

The subjective prong "turns on the defendant's state of mind." *Id.* at 794. "To satisfy this prong, the plaintiff must show that the defendant was aware of a substantial risk of serious harm and chose to disregard that risk." *Id.* "A plaintiff may prove awareness of a substantial risk through circumstantial evidence that the risk was obvious." *Id.* For example, the subjective prong may be satisfied "through reports of pain, . . . repeated requests for medical treatment, and other detainees' insistence that the need for medical attention was obvious." *Id.* at 796. However, "a claim of deliberate indifference cannot be based on speculation about what [the defendant] might have seen or heard." *Id.* at 795. Even if a guard or other official sees an inmate who is "allegedly suffering from a severe illness," the complaint must still identify which specific symptoms that defendant would have seen. *Id.* (citing *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020)).

In large part, resolution of the Motions [#45, #48, #79] rests on whether the various Defendants "chose to disregard [the] risk" to Plaintiff, even assuming that his condition was

---

to Fourteenth Amendment claims for deliberate indifference to serious medical needs. *Response* [#59] at 14. Although this has been an unsettled issue in the Tenth Circuit for some time, after the briefing on the present Motions was completed, the Tenth Circuit unambiguously rejected this argument in *Strain v. Regalado*, 977 F.3d 984, 993 (10th Cir. 2020). Thus, the Court rejects Plaintiff's argument and uses the standard two-prong test for such claims here.

objectively serious enough and even assuming that each Defendant was subjectively aware of a substantial risk of serious harm.  Thus, despite the repetitive nature of some of the allegations, the Court separately examines how they apply to Plaintiff's claim as to each individual Defendant.  Ultimately, "[a]lthough Plaintiff's claims may smack of negligence, [the Court] conclude[s] that they fail to rise to the high level of deliberate indifference against any Defendant."  *Strain*, 977 F.3d at 997; *see also Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (holding that "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation"); *cf. Stack v. McCotter*, 79 F. App'x 383 (10th Cir. 2003) (holding that a seven-month delay in obtaining appropriate care involving progressive dental concerns could give rise to a cause of action for deliberate indifference).  Issues relating to misdiagnosis, inadequate treatment, or failure to transfer to a hospital (as opposed to treating in-house) will rarely rise to the level of deliberate indifference, as these issues more typically relate to negligence or medical malpractice.  *See Strain*, 977 F.3d at 995-96.

## A.    Defendant Yager

Defendant Yager assisted Defendant Andaya in performing the tooth extraction procedure on Plaintiff on September 14.  *Am. Compl.* [#38] ¶ 15.  She (and Defendant Andaya) noted that there was perio involvement, likely due to infection, but did not give Plaintiff any antibiotics that day.  *Id.* ¶ 16.  No other allegations relate to Defendant Yager. These scant allegations do not permit the Court to find that the issue of perio involvement was an objectively serious medical issue *at that time* so as to show that Defendant Yager disregarded a "substantial" or "excessive" risk to Plaintiff's safety/medical needs.  *See Lance*, 985 F.3d at 793.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Yager under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990) (holding that prejudice should not attach to a dismissal when the plaintiff has made allegations "which, upon further investigation and development, could raise substantial issues").

## B.   Defendant Andaya

Defendant Andaya performed the tooth extraction procedure on Plaintiff on September 14. *Am. Compl.* [#38] ¶ 15. She (and Defendant Yager) noted that there was perio involvement, likely due to infection, but did not give Plaintiff any antibiotics that day. *Id.* ¶ 16. Four days later, shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant Andaya (and others) when Plaintiff was brought to the medical center in a wheelchair. *Id.* ¶¶ 33-34. Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing." *Id.* ¶ 35. Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, and "they" gave him his morning medication at this time. *Id.* Later that same day, shortly after 4:50 p.m., Defendant Andaya (and others) advised Deputy McCann that Plaintiff "had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for" him. *Id.* ¶ 39. Plaintiff does not

specifically allege which decisions Defendant Andaya made or over which she had final authority.  No other allegations relate to Defendant Andaya.

Regarding the events of September 14, the Court reaches the same conclusion as it did with respect to Defendant Yager above.  *See supra* § III.A.  These scant allegations do not permit the Court to find that the issue of perio involvement was an objectively serious medical issue *at that time* so as to show that Defendant Andaya disregarded a "substantial" or "excessive" risk to Plaintiff's safety/medical needs.  *See Lance*, 985 F.3d at 793.  Regarding the events of September 18, Plaintiff was, in short, examined by Defendant Andaya, given medication by her (and others) in the morning and in the afternoon she (and others) said that there was nothing else that could be done for Plaintiff while waiting for the medication to take effect.  Thus, Plaintiff was seen and treated by Defendant Andaya that day, and she provided her medical opinion that nothing else could be done until the medication took effect.  *See Strain*, 977 F.3d at 994 (holding that the plaintiff's "factual allegations suggest that [d]efendants diagnosed [him] with a less severe case of alcohol withdrawal and at least attempted to treat [his] symptoms").  Although Defendant Andaya's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given her alleged actions in attempting to treat Plaintiff's medical needs.  *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Andaya under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

**C.      Defendant Anding**

-14-

Plaintiff makes no specific allegations regarding Defendant Anding beyond listing her along with most of the other Defendants to say that, "[a]t various times between September 15 and September 18, 2017, Plaintiff Valdez sought help for his worsening infection from personnel of the Denver Detention Center and/or Denver Health including . . . Tamatha Anding, LPN," and that "Plaintiff's severe medical condition was evident due to swelling in his jaw and down into his neck and chest, discoloration, difficulty speaking and breathing, as well as Plaintiff Valdez's overall presentation as an individual suffering from a serious illness." *Am. Compl.* [#38] ¶ 23. Given the lack of any specific allegations as to what Defendant Anding knew, when Defendant Anding knew it, or what actions Defendant Anding took or failed to take, the Court cannot find that Plaintiff has adequately alleged that Defendant Anding disregarded a "substantial" or "excessive" risk to Plaintiff's safety/medical needs. *See Lance*, 985 F.3d at 793-94.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Anding under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 127.

## D.     Defendant Lindsey

On September 15, Plaintiff reported his symptoms (including significant pain, a lump developing on the left side of his neck, significant problems swallowing food and liquid, and tasting indications of infection in his mouth) to Defendant Lindsey (and at least one other) who prescribed him a course of penicillin but did not seek to provide emergency treatment or ensure that Plaintiff was examined by a medical doctor. *Am. Compl.* [#38] ¶¶ 18-19. At about 5:36 p.m. on September 16, Defendant Lindsey (along with one other defendant)

saw Plaintiff and noted that his throat appeared less swollen than it had the previous day but that his left jaw was swollen. *Id.* ¶ 21. She provided Plaintiff "with a bag of ice, told him that his symptoms were normal following a tooth extraction, and sent him back to his cell." *Id.* No other allegations relate to Defendant Lindsey.

Regarding the events of September 15, Plaintiff was examined by Defendant Lindsey and was provided medication by her. Regarding the events of September 16, Defendant Lindsey again examined Plaintiff, deemed his symptoms to be normal following a tooth extraction, and gave him ice to numb Plaintiff's pain. Thus, Plaintiff was seen and treated by Defendant Lindsey not once but twice over a two-day period. *See Strain*, 977 F.3d at 994. Although Defendant Lindsey's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given her alleged actions in attempting to treat Plaintiff's medical needs. *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Lindsey under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 127.

## E.     Defendant Dranginis

On September 15, Plaintiff reported his symptoms (including significant pain, a lump developing on the left side of his neck, significant problems swallowing food and liquid, and tasting indications of infection in his mouth) to Defendant Dranginis (and at least one other) who prescribed him a course of penicillin but did not seek to provide emergency treatment or ensure that Plaintiff was examined by a medical doctor. *Am. Compl.* [#38] ¶¶ 18-19. Three days later, shortly after 10:15 a.m. on September 18, Plaintiff was seen by

Defendant Dranginis (and others) when Plaintiff was brought to the medical center in a wheelchair. *Id.* ¶¶ 33-34. Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing." *Id.* ¶ 35. Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time. *Id.* Plaintiff does not specifically allege which decisions Defendant Dranginis made or over which she had final authority. No other allegations relate to Defendant Dranginis.

Regarding the events of September 15, the Court reaches the same conclusion as it did with respect to Defendant Lindsey above. *See supra* § III.D. Plaintiff was examined by Defendant Dranginis and was provided medication by her. Regarding the events of September 18, Plaintiff was, in short, examined by Defendant Dranginis that morning and given medication. Thus, Plaintiff was seen and treated by Defendant Dranginis not once but twice during this period. *See Strain*, 977 F.3d at 994. Although Defendant Dranginis's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given her alleged actions in attempting to treat Plaintiff's medical needs. *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Dranginis under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 127.

**F.    Defendant Klotz**

-17-

At about 5:36 p.m. on September 16, Defendant Klotz (along with one other defendant) saw Plaintiff and noted that Plaintiff "reported experiencing pain, swelling and difficulty breathing following tooth removal." *Am. Compl.* [#38] ¶ 21.  He provided Plaintiff "with a bag of ice, told him that his symptoms were normal following a tooth extraction, and sent him back to his cell." *Id.*  Two days later, shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant Klotz (and others) when Plaintiff was brought to the medical center in a wheelchair. *Id.* ¶¶ 33-34.  Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing." *Id.* ¶ 35.  Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time. *Id.*  When Plaintiff "indicated that he could not return to his cell under his own power," Defendant Klotz (and others) accused him of exaggerating or faking his symptoms and refused to provide him with a wheelchair so he could safely return to his cell. *Id.* ¶ 36.  Later that same day, shortly after 4:50 p.m., Defendant Klotz (and others) advised Deputy McCann that Plaintiff "had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for" him. *Id.* ¶ 39.  Plaintiff does not specifically allege over which decisions Defendant Klotz had final authority.  No other allegations relate to Defendant Klotz.

Regarding the events of September 15, the Court reaches the same conclusion as it did with respect to Defendant Lindsey above. *See supra* § III.D.  Defendant Klotz

examined Plaintiff, deemed his symptoms to be normal following a tooth extraction, and gave him ice to numb Plaintiff's pain.  Regarding the events of September 18, Plaintiff was, in short, examined by Defendant Klotz and given medication both in the morning and in the afternoon, and Defendant Klotz said that there was nothing else that could be done for Plaintiff while waiting for the medication to take effect.  Thus, Plaintiff was seen and treated by Defendant Klotz not once but twice that day.  *See Strain*, 977 F.3d at 994.  Although Defendant Klotz's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given his alleged actions in attempting to treat Plaintiff's medical needs.  *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Klotz under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

## G.    Defendant Stob

Shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant Stob (and others) when Plaintiff was brought to the medical center in a wheelchair.  *Id.* ¶¶ 33-34. Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing."  *Id.* ¶ 35.  Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time.  *Id.*   Plaintiff does not specifically allege which

decisions Defendant Stob made or over which he had final authority. No other allegations relate to Defendant Stob.

Regarding these events of September 18, the Court reaches the same conclusion as it did with respect to Defendant Dranginis above. *See supra* § III.E. Plaintiff was, in short, examined by Defendant Stob and given medication in the morning. Thus, Plaintiff was seen and treated by Defendant Stob that day. *See Strain*, 977 F.3d at 994. Although Defendant Stob's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given his alleged actions in attempting to treat Plaintiff's medical needs. *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Stob under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 127.

## H. Defendant Montoya

Shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant Montoya (and others) when Plaintiff was brought to the medical center in a wheelchair. *Am. Compl.* [#38] ¶¶ 33-34. Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing." *Id.* ¶ 35. Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time. *Id.* When Plaintiff "indicated that he could not return

to his cell under his own power," Defendant Montoya (and others) accused him of exaggerating or faking his symptoms and refused to provide him with a wheelchair so he could safely return to his cell.  *Id.* ¶ 36.  Later that same day, shortly after 4:50 p.m., Defendant Montoya (and others) advised Deputy McCann that Plaintiff "had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for" him.  *Id.* ¶ 39.  Plaintiff does not specifically allege which decisions Defendant Montoya made or over which decisions she had final authority.  No other allegations relate to Defendant Montoya.

Regarding these events on September 18, Plaintiff was, in short, examined by Defendant Montoya and given medication by her that morning, and she was then consulted in the afternoon but said that there was nothing else that could be done for Plaintiff while waiting for the medication to take effect.  Thus, Plaintiff was seen and treated by Defendant Montoya and she offered her medical opinion on his condition when consulted that afternoon. *See Strain*, 977 F.3d at 994.  Although Defendant Montoya's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given her alleged actions in attempting to treat Plaintiff's medical needs.  *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Montoya under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

## I.    Defendant Breznay

Shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant Breznay (and others) when Plaintiff was brought to the medical center in a wheelchair.  *Am. Compl.*

[#38] ¶¶ 33-34.  Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing."  *Id.* ¶ 35.  Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time.  *Id.*  Later that same day, shortly after 4:50 p.m., Defendant Breznay (and others) advised Deputy McCann that Plaintiff "had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for" him.  *Id.* ¶ 39.  Plaintiff does not specifically allege which decisions Defendant Breznay made or over which decisions he had final authority.  No other allegations relate to Defendant Breznay.

Regarding these events of September 18, Plaintiff was, in short, examined by Defendant Breznay and given medication that morning and in the afternoon he said that there was nothing else that could be done for Plaintiff while waiting for the medication to take effect.  Thus, Plaintiff was seen and treated by Defendant Breznay in the morning and consulted in the afternoon as to Plaintiff's condition.  *See Strain*, 977 F.3d at 994.  Although Defendant Breznay's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given his alleged actions in attempting to treat Plaintiff's medical needs.  *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant Breznay under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

**J.      Defendant A. Johnson**

Shortly after 10:15 a.m. on September 18, Plaintiff was seen by Defendant A. Johnson (and others) when Plaintiff was brought to the medical center in a wheelchair.  *Am. Compl.* [#38] ¶¶ 33-34.  Plaintiff alleges that "[n]otes from the visit indicate that Plaintiff Valdez was suffering from significant throat pain and was unable to open his mouth" and that "[b]y this time, symptoms of Plaintiff Valdez's steadily worsening infection were plainly visible and included a large lump, increasing swelling down through his throat and chest, discoloration, and difficulty opening his mouth and swallowing." *Id.* ¶ 35.  Despite Plaintiff's repeated requests, "medical personnel" declined to transport him to the hospital, but "they" gave him his morning medication at this time.  *Id.*  Later that same day, shortly after 4:50 p.m., Defendant A. Johnson (and others) advised Deputy McCann that Plaintiff "had been seen already, that he simply needed to wait for his medication to take effect, and that there was nothing more that medical personnel could do for" him.  *Id.* ¶ 39.  When Defendant Brown was called by Deputy McCann to respond to Pod 3F based on Plaintiff's refusal to return to his cell at this time, Defendant Brown first spoke with Defendant A. Johnson, who "told him that Valdez had recently seen the dentist, had received medication that would take time to take effect, and therefore did not require additional treatment." *Id.* ¶¶ 40-41.  Plaintiff does not further specify which decisions Defendant A. Johnson made or over which decisions she had final authority.  No other allegations relate to Defendant A. Johnson.

Regarding these events of September 18, Plaintiff was, in short, examined by Defendant A. Johnson and given medication in the morning and in the afternoon she said that there was nothing else that could be done for Plaintiff while waiting for the medication to take effect.  Thus, Plaintiff was seen and treated by Defendant A. Johnson in the

morning, and she offered her consultative opinion in the afternoon as to Plaintiff's condition. *See Strain*, 977 F.3d at 994.  Although Defendant A. Johnson's actions *may* have been negligent, they do not rise to the high level of deliberate indifference given her alleged actions in attempting to treat Plaintiff's medical needs.  *See id.* at 997.

Accordingly, the Medical Defendants' Motion [#45] is **granted** to the extent that Plaintiff's Claim One against Defendant A. Johnson under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

## K.    Defendant Stepp

Turning to the three non-medical individual Defendants, when Plaintiff returned to the Detention Center from his court appearance on September 18, he requested to go to medical to obtain his medication and seek treatment for his condition.  *Am. Compl.* [#38] ¶ 26.  Shortly after 9:45 a.m., Plaintiff entered a secured sally port, from which he was to proceed to the medical center.  *Id.* ¶ 27.  Once he entered the sally port, Defendant Stepp, the on-duty housing officer who was responsible for arranging to convey Plaintiff to the medical center for treatment, would not allow Plaintiff to exit and proceed to the medical clinic.  *Id.* ¶¶ 26-27.  Instead, Defendant Stepp left Plaintiff to wait in the sally port for well in excess of a typical wait time.  *Id.* ¶ 27.  Meanwhile, as Plaintiff waited, Defendant Stepp made personal phone calls on a Detention Center telephone, in violation of Denver Sheriff Department policy.  *Id.* ¶ 28.  After an undisclosed period, Plaintiff returned to his cell, shortly after which he began banging on his cell window, requesting permission to get his medication.  *Id.* ¶ 28.  Defendant Stepp insisted to Plaintiff that he had refused his medication.  *Id.*

Overcome by pain, weakness, nausea, and other symptoms of infection, Plaintiff collapsed onto the floor, asking a cell mate to contact deputies and request that they declare a medical emergency.  *Id.*  One or more of his cell mates attempted to contact deputies, including Defendant Stepp, to inform them that Plaintiff's condition was serious and that he required immediate medical attention.  *Id.* ¶ 29.  Defendant Stepp arrived, opened the cell door, and ordered Plaintiff to "get up" and go to medical.  *Id.* ¶ 30.  Plaintiff responded that he had become too severely ill to reach the medical center under his own power, that he was having trouble breathing, and that he needed assistance to help him get to the medical center.  *Id.*  Defendant Stepp then became openly hostile toward Plaintiff, berating him in front of other inmates and accusing him of fabricating (saying that Plaintiff was "fucking lying") and/or exaggerating the extent of his medical condition (saying that Plaintiff was "full of shit").  *Id.* ¶ 31.  Ultimately, Defendant Stepp declared "I am not calling a medical emergency – you can get up."  *Id.*

Regarding the sally port incident, Plaintiff has failed to allege what Defendant Stepp subjectively knew, if anything, about Plaintiff's condition and/or whether he knew anything about the alleged urgency of his condition.  *See Lance*, 985 F.3d at 795 (stating that, even if a guard or other official sees an inmate who is "allegedly suffering from a severe illness," the complaint must still identify which specific symptoms that defendant would have seen).  Thus, the Court cannot find that Plaintiff has sufficiently alleged deliberate indifference to a serious medical need when it is unclear whether Defendant Stepp knew about Plaintiff's alleged serious medical need in the first place.  *See id.* (stating that "a claim of deliberate indifference cannot be based on speculation about what [the defendant] might have seen or heard").

Defendant Stepp's alleged actions at Plaintiff's cell are more troubling.  However, medical delays are only "sufficiently serious if they cause substantial harm, such as permanent loss or considerable pain." *Lance*, 985 F.3d at 793.  Here, the Court first notes that any delay caused by Defendant Stepp which occurred in Plaintiff's cell appears to have been minimal.  Plaintiff alleges that he entered the sally port at 9:45 a.m. and was there for an excessively long period (at least long enough for Defendant Stepp to make multiple personal phone calls) before he returned to his cell.  It is unclear precisely what time Defendant Stepp came to Plaintiff's cell thereafter, but it cannot have been long, because Plaintiff alleges that at 10:15 a.m., after Defendant Stepp's actions in the cell, another deputy called a medical emergency.  Thus, all of these events occurred in the space of thirty minutes, and, even taking the allegations in a light most favorable to Plaintiff, it appears that any delay caused by Defendant Stepp's alleged actions was a matter of a minutes, at most.  There are no allegations that these few minutes caused Plaintiff "permanent loss or considerable pain," given that Plaintiff merely alleges here that he was too weak to go to medical under his own power.  *See Lance*, 985 F.3d at 793; *cf. McCowan v. Morales*, 945 F.3d 1276, 1292 (10th Cir. 2019) (holding that the deliberate indifference standard was satisfied where the officer disregarded the detainee's repeated complaints of excruciating should pain for about two hours); *Sealock v. Colorado*, 218 F.3d 1205, 1208 (10th Cir. 2000) (holding that the deliberate indifference standard was satisfied where the officer waited more than a day to obtain medical treatment despite the inmate's clear signs of a heart attack).  In addition, there are no allegations here that Defendant Stepp refused to allow Plaintiff to go to medical at this time.  In fact, Plaintiff affirmatively alleges that Defendant Stepp, when first arriving at Plaintiff's cell, had told Plaintiff that he could get up

and go to medical. *Am. Compl.* [#38] ¶ 30. Although Defendant Stepp's alleged hostility toward Plaintiff in refusing to call a *medical emergency* may have been unprofessional or even negligent toward his duties, the Court cannot find that his conduct rises to the level of deliberate indifference to a serious medical need under the precise circumstances alleged here.

Accordingly, Defendant Stepp's Motion [#75] is **granted** to the extent that Plaintiff's Claim One against Defendant Stepp under the Fourteenth Amendment is **dismissed without prejudice**. *See Reynoldson*, 907 F.2d at 127.

## L.   Defendant Brown

The afternoon of September 18, Defendant Brown responded to Pod 3F along with Defendant J. Johnson after Deputy McClain contacted them when Plaintiff refused to return to his cell and lock down. *Am. Compl.* [#38] ¶ 40. Before coming to Pod 3F, Defendant Brown spoke with Defendant A. Johnson about Plaintiff. *Id.* ¶ 41. She told him that Plaintiff had recently seen the dentist, had received medication that would take time to take effect, and did not require additional treatment at that time. *Id.* Defendant Brown therefore ordered Plaintiff to stop seeking medical attention and told him that medical staff had indicated that there was nothing more they could do. *Id.* ¶ 42. Plaintiff responded that he would not go back to his cell until he received further medical attention, and he again requested that Defendant Brown declare a medical emergency and arrange for Plaintiff to be transported to Denver Health Medical Center. *Id.* ¶ 43. Defendant Brown then yelled to the pod that no one would be allowed their 'out time' until Plaintiff locked down, in effect placing the entire pod on lock down. *Id.* ¶ 44. Other inmates responded by telling

Defendant Brown that Plaintiff needed further medical attention, but, nevertheless, Plaintiff, not wanting to inconvenience other inmates and fearful of becoming a victim of retaliation and violence, reluctantly returned to his cell and locked down.  *Id.* ¶ 46.

Based on these allegations, the Court cannot find that Defendant Brown's conduct rises to the level of deliberate indifference to a serious medical need.  "[W]hen an individual's sole purpose is 'to serve as a gatekeeper for other medical personnel,' and that person delays or refuses to fulfill the gatekeeper role, he may be liable for deliberate indifference."  *Estate of Jensen by Jensen v. Clyde*, __ F.3d __, __, No. 20-4025, 2021 WL 787451, at *8 (10th Cir. Mar. 2, 2021) (quoting *Sealock*, 218 F.3d 1208).  Here, however, Defendant Brown immediately contacted medical personnel and received information that Plaintiff had recently seen the dentist, had received medication that would take time to take effect, and did not require additional treatment at that time, and that there was nothing more that medical personnel could do at that time.  Although Defendant Brown's conduct in failing to obtain further help or a separate medical opinion *may* have been negligent, it certainly does not rise to the high level of deliberate indifference under the Fourteenth Amendment given his actions in contacting medical personnel.  *See Strain*, 977 F.3d at 997.

Accordingly, the Denver Defendants' Motion [#48] is **granted** to the extent that Plaintiff's Claim One against Defendant Brown under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

**M.    Defendant J. Johnson**

The afternoon of September 18, Defendant J. Johnson responded to Pod 3F along

with Defendant Brown after Deputy McClain contacted them when Plaintiff refused to return to his cell and lock down.  *Am. Compl.* [#38] ¶ 40.  Given what Defendant A. Johnson had told Defendant Brown, Defendant J. Johnson agreed with Defendant Brown that Plaintiff had to stop seeking medical attention at that time.  *Id.* ¶ 42.

Based on these allegations, the Court cannot find that Defendant J. Johnson's conduct rises to the level of deliberate indifference to a serious medical need.  In fact, the allegations indicate that Defendant J. Johnson relied directly on the information Defendant Brown obtained from medical personnel, i.e., that Plaintiff had recently seen the dentist, had received medication that would take time to take effect, and did not require additional treatment at that time, and that there was nothing more that medical personnel could do at that time.  Thus, Defendant J. Johnson's gatekeeper responsibilities were fulfilled. *Estate of Jensen*, 2021 WL 787451, at *8.  Although Defendant J. Johnson's conduct in failing to obtain further help or a separate medical opinion *may* have been negligent, it certainly does not rise to the high level of deliberate indifference under the Fourteenth Amendment given the information obtained medical personnel.  *See Strain*, 977 F.3d at 997.

Accordingly, the Denver Defendants' Motion [#48] is **granted** to the extent that Plaintiff's Claim One against Defendant J. Johnson under the Fourteenth Amendment is **dismissed without prejudice**.  *See Reynoldson*, 907 F.2d at 127.

## N.      The Entity Defendants

Plaintiff's Claim One for deliberate indifference to medical care is asserted "[a]gainst [a]ll Defendants," *Am. Compl.* [#38] at 34, and Plaintiff's Claim Two for municipal liability

is asserted only "[a]gainst Defendants Denver Health; City & County of Denver," *id.* at 37. However, the Court is unable to discern the difference between Claim Two and Claim One to the extent Claim One is asserted against the two entity Defendants.  Both discuss alleged shortcomings in policies, customs, practices, training, and supervision.  *Compare id.* [#38] ¶¶ 144-149 (Claim One) *with id.* ¶¶ 154-159 (Claim Two).  The allegations of Claim One do not appear to be directed at entirely differently aspects of Plaintiff's claims from those asserted in Claim Two.  Thus, the Court addresses these claims together to the extent asserted against the two entity Defendants.

Plaintiff alleges that the City and County of Denver, through its Department of Safety, is responsible for the Denver Police Department and the Denver Sheriff's Department and ultimately has a nondelegable duty to provide adequate medical care to inmates and detainees at the Detention Center.  *Id.* ¶ 8.  Plaintiff further alleges that Denver Health and Hospital Authority, doing business as Denver Health Medical Center, is a political subdivision of the State of Colorado and provides medical services and care at the Detention Center pursuant to one or more agreements with the City and County of Denver. *Id.* ¶ 9.

In order to establish municipal liability under *Monell*, which the parties agree applies to both entity defendants, a plaintiff must show (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004); *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *see also Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other

words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 405 (1997).

Here, the Court finds that Plaintiff has not adequately alleged the first element of a municipal liability claim, i.e., that a municipal employee committed a constitutional violation. *See Jiron*, 392 F.3d at 419. The Court has already held, as discussed above, that Plaintiff has not sufficiently alleged claims against the named individual Defendants. In their Motion [#48], the Denver Defendants also address whether Plaintiff's allegations against other personnel identified by name in the Amended Complaint [#38], but not named as defendants, are sufficient to meet the first element of this claim. *See Motion* [#48] at 5 (discussing Deputies McClain, McCann, and West). However, Plaintiff does not address this argument in his Response [#60], and there appears to be no basis on which the Court could find that Plaintiff is actually asserting that the first element of his municipal liability claim could be met through the alleged actions (or inactions) of any non-defendant. Thus, in short, the Court finds that Plaintiff has failed to adequately allege the first element of his municipal liability claims.

Accordingly, the Motions [#45, #48] are **granted** to the extent that Plaintiff's Claim One and Claim Two are **dismissed without prejudice** to the extent asserted against Defendants Denver Health and City and County of Denver. *See Reynoldson*, 907 F.2d at

127.

## I.      State Law Claims

Plaintiff's Claim Three (negligence), Claim Four (negligent training and supervision), and Claim Five (respondeat superior) are all based on state law. *Am. Compl.* [#38] ¶¶ 161-175.  However, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims." *Smith v. City of Enid ex rel Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).  Because the only federal claims before the Court have been dismissed, the Court declines to exercise jurisdiction over the state law claims.

Accordingly, the Motions [#45, #48] are **granted** to the extent that Plaintiff's state law claims (Claims Three, Four, and Five) are **dismissed without prejudice**.  *See Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (stating that where supplemental jurisdiction is declined over state law claims, those claims must be dismissed without prejudice).

## IV.  Conclusion

For the reasons set forth above,

IT IS HEREBY **ORDERED** that the Motions [#45, #48, #75] are **GRANTED** and all claims are **DISMISSED without prejudice**.

IT IS FURTHER **ORDERED** that the Clerk of Court shall **CLOSE** this case.

Dated:  March 19, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge